### Case No. 7,326.

The J. L. HASBROUCK.

[14 Blatchf. 30.] [1]

Circuit Court, S. D. New York. Nov. 11, 1876.[2]

James K. Hill, for libellants.
Robert D. Benedict, for claimants.

JOHNSON, Circuit Judge. The libel in this case was filed to recover for the loss of the

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming Case No. 7,325.]

canal-boat Frank Curran, which, as was alleged, was sunk by the fault of the claimants, while she was being towed from New York to Low Point on the Hudson river. The district court decided [Case No. 7,324] that the claimants were not in fault in respect to any injury sustained by the canal-boat during the voyage from New York to Fort Montgomery, where she was detached from the propeller, but that those injuries were owing to her unseaworthiness and her being in a leaky condition. It further decided, that, in the casting off of the canal-boat from the propeller at Fort Montgomery, under the circumstances proved, both vessels were in fault —the canal-boat in having made no proper preparation of her lines for landing, and in having no anchor; the propeller in leaving the canal-boat unassisted, knowing that she was being cast off in consequence of some difficulty, before reaching her destination. It, therefore, decreed, that the propeller was bound to answer to the owners of the canal-boat for one-half the damages thus incurred, and declared those damages to be equal to the value of the canal-boat in the condition she was in when she was cast off. The cause was thereupon referred to a commissioner to ascertain these damages and report the same to the court. He subsequently reported the damages at $3,500, with interest to the date of the report, amounting in all to $4,200. To this report the claimants excepted on various grounds. Upon the hearing they were all overruled, and the court pronounced its decree, awarding to the libellants one-half of the damages so assessed, with interest from the date of the report. See [Case No. 7,325]. From this decree the libellants appealed to this court, and they claim that all the damages sustained by the canal-boat ought to have been recovered by the libellants. The claimants also appealed, claiming that the propeller was not in fault, and ought not to be charged with any part of the damages sustained by the loss of the canal-boat. They likewise contend that the exceptions to the commissioner's report, or some of them, ought to have been allowed, and that the decree should, in any case, have been for a smaller sum.

After a careful examination of the evidence, it is established to my satisfaction, that the agreement for towing this canal-boat was not made at Poughkeepsie, but at New York, with the captain of the propeller, and that the allegations of the answer in that respect are substantially sustained. In the execution of the contract the persons in charge of the propeller exhibited, in respect to the speed at which they moved, much consideration for the condition of the canal-boat. In the ten hours preceding the time of the final start, they made only 45 miles, which, in itself, is a substantial overthrow of the claim on the part of the libellants, that the propeller made ten miles an hour. It affirmatively appears, that, early in the voyage, up-

on the statement of the captain of the canal-boat, that she was loaded by the head too much, and that her seams that had been above the water were open and let in a little water, the captain of the propeller proposed to land her at or near Weehawken, but that Captain Atkins declined, alleging that he was moving the flour, which was part of his cargo, to the after part of the boat, and that there would be no danger after that change was made. The captain of the propeller then ordered the engineer to run at half speed all night. The engineer testified, that he reduced the steam pressure and throttled the engine, so as to reduce the speed fully one-half; that, while in motion, they averaged but five miles an hour, until they got out of the ice; and that they afterwards ran at not over six miles, till the canal-boat was cast off at Fort Montgomery. Against this evidence there are only vague statements of great speed on the part of the claimants, which are not, in my judgment, sufficient to establish any fault on the part of the propeller in this respect.

In respect to the allegation of want of care in taking the boat in tow, it may be properly answered, that, if there was any original want of care on first starting from the city of New York, no damage appears to have resulted. If the allegation includes the manner of towing during the residue of the voyage, various ways of fastening the barge and canal-boat in different positions seem to have been tried, as one after another seemed to present difficulties, but the fair result of the evidence is, I think, that the propeller was not in fault.

In respect to the ice, it was made that night, and was a mere skim at first. Upon the complaint of the captain of the canal-boat, her place was changed, so that she was astern of the barge, and that astern of the propeller. It was to make this change that the propeller was stopped, and not because she could not make her way through the ice. But the clear proof that the boat was not harmed by the ice is, that, although she made some water from the early part of the voyage, in consequence of the open seams near her bow, it was not until an hour after the ice was passed that Captain Atkins regarded the leak as of any moment. Albertson says the boat began to leak near Haverstraw or Grassy Point, and that up to that time there had been no difficulty from any leak. At this point of time Atkins and Albertson became alarmed, and insisted that the canal-boat should be landed. The people in charge of the propeller, (the canal-boat, as Albertson says, not leaking much then,) made motions indicating that they would land the canal-boat at a dock below Haverstraw; but Albertson declined to land there, he having ascertained that he could not get across the river from that point, and made motions for the propeller to go on, and told them to land the boat at Grassy Point. The propeller

sheered in to land the canal-boat at that point, and stopped or slowed, but Atkins then declined to cast his boat off. As they came near Fort Montgomery, Atkins hailed the propeller to land the boat, and that it was leaking. Albertson also hailed the propeller to land the boat there. The propeller ran in towards the dock at Fort Montgomery, the engine was stopped, and the canal-boat was hailed to cast off. She was cast off by the hands on board, but one of the lines jammed, and was not unfastened till it was broken by the starting of the propeller. No preparation of lines had been made aboard the canal-boat, her way had been checked by the line which had not been cast off, she was left about 400 feet from the dock, and the tide and wind carried her upward and away from the dock. A boat came to her from the shore, time was lost in getting out her lines, those which were in readiness were not long enough to reach the shore, and the boat from shore had not power enough to tow her. She had lines sufficient to reach the shore, if they had been in readiness. She had no anchor, so that no attempt could be made to hold her. The result was, that she drifted north of the dock, and out into the river, and finally, an hour or more after she was cast off, she sank, having drifted about a mile from the place where the propeller left her.

To the final catastrophe. I think it plain that the fault of the canal-boat contributed, and that to this, as well as to her unseaworthy condition, her loss is due; but I cannot exonerate the propeller from fault, under all the circumstances. It is true, that the usual way of landing boats from a tow, is to sheer in towards the dock and cast off their lines; but, in this case, the persons in command of the propeller knew, at least, that it was owing to something out of the usual course, that the canal-boat desired to land before arriving at her destination, and that she was leaking. This imposed upon the propeller the obligation not to leave her except in safety, or, at least, without some effort to secure her safety. So far from making any such effort, entire indifference seems to have been manifested in respect to her condition, and this contributed to the loss. It is quite true that a tug-boat is not an insurer or common carrier, in respect to the boats she takes in tow, but she still remains bound to employ that degree of caution and skill which prudent navigators usually employ in similar cases. The Webb, 14 Wall. [81 U. S.] 406, 414. The special contract made by third parties, did not exempt the propeller from that degree of care. I am, therefore, of opinion, that the decree of the district court was correct in charging the loss of the canal-boat equally to the propeller and to the canal-boat, and making its decree against the propeller for one-half the amount.

The value of the boat was, I think, to be estimated, not as she was after she had been cast adrift by the propeller, but as she was just before that time, while she might still have been saved from sinking by aid from the propeller, and brought to land. In this view, which I understand to be, in substance, that taken by the commissioner and the district court, in the judgment actually pronounced, I concur in the estimate of value and damage made in the district court. Judgment must be rendered accordingly.